# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|  |  |
|---|---|
| EXELON GENERATION COMPANY, LLC | ) |
| Plaintiff/Counter-Defendant, | ) |
| v. | ) No. 06 CV 6961 |
| LOCAL 15, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO, | ) Judge Joan H. Lefkow |
| Defendant/Counter-Plaintiff. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff/counter-defendant Exelon Generation Company, LLC ("Exelon") filed a single-count declaratory judgment complaint against Local 15, International Brotherhood of Electrical Workers, AFL-CIO ("Local 15") seeking a declaration that Exelon's decision to deny unescorted access authorization to Terrence McMahon ("McMahon") is not arbitrable under the parties' collective bargaining agreement ("CBA"). Local 15 counterclaimed to compel arbitration of the grievances which it filed on his behalf concerning Exelon's decision to deny McMahon site access and terminate his employment. Presently before the court are the parties' cross-motions for summary judgment, as well as Local 15's motion to stay proceedings and compel arbitration. For the following reasons, Local 15's motion for summary judgment [#39] is granted, Exelon's motion for summary judgment [#44] is denied, and Local 15's motion to stay proceedings and compel arbitration [#38] is granted.

## JURISDICTION

The court has jurisdiction to hear this case pursuant to 29 U.S.C. § 185 (Labor Management Relations Act) and 28 U.S.C. §§ 1331, 2201.

## STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©. The court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The dispute in this case primarily concerns statutory and regulatory construction and contract interpretation, matters of law particularly suited to summary adjudication. *See Automation by Design, Inc.* v. *Raybestos Prods. Co.*, 463 F.3d 749, 753 (7th Cir. 2006); *APS Sports Collectibles, Inc.* v. *Sports Time, Inc.*, 299 F.3d 624, 628 (7th Cir. 2002).

## BACKGROUND

Exelon is a company engaged in the business of nuclear power generation and supply via several nuclear generating units in Pennsylvania, Illinois, and New Jersey. Exelon is licensed to conduct nuclear power generation by the Nuclear Regulatory Commission ("NRC") and is subject to the agency's regulations. Local 15 is a labor union that represents approximately 1,600 hourly employees at Exelon's nuclear generating units in Illinois. Exelon and Local 15 are parties to a CBA and have engaged in collective bargaining for over fifty years. The arbitration clause in the parties' current CBA provides:

> Should any dispute or difference arise between the Company and the Union or its members as to the interpretation or application of any of the provisions of this

2

> Agreement or with respect to job working conditions, the term working
> conditions being limited to those elements concerned with the hours when an
> employee is at work and the acts required of the employee during such hours, the
> dispute or difference shall be settled through the grievance procedure.

The grievance procedure defined in the CBA includes four steps: (1) "local investigation" involving union stewards and Exelon's department-level supervisory personnel; (2) consideration by a "business unit joint grievance committee" consisting of union business representatives and Exelon managerial personnel; (3) review of the grievances by a committee consisting of the union's and Exelon's senior managers; and (4) arbitration.

McMahon was an Exelon employee and is a member of the Nuclear Physical, Commercial Physical, and Clerical Workers bargaining unit defined in the CBA. Local 15 is his exclusive bargaining representative. Exelon hired McMahon as a station laborer at the now decommissioned Zion Generating Station in 1980. McMahon was promoted to nuclear mechanic in 1982 and maintained that position at the Braidwood Generating Facility, where he began working in 1998. McMahon was laid off from his mechanic's position at Braidwood in 2001, but, pursuant to an ensuing arbitration award which determined that his layoff was improper, he was offered the opportunity to be recalled into a lower-paying station laborer position at Exelon's Byron Generating Station. McMahon never began working at Byron, however, because Exelon's Nuclear Security Department denied him the unescorted access authorization required to perform his job there, based on a psychological screening test and subsequent clinical interview.[1]

---

[1] While McMahon had unescorted access authorization in all of his former positions with Exelon, he was never required to undergo a psychological evaluation because prior to his 2001 termination, he had fallen under the NRC's grandfathering provisions, which exempted him from such pre-access screening. After McMahon was laid off in 2001, he was without unescorted

On February 28, 2008, McMahon was informed that his application for unescorted access was denied, and on March 1, 2005, his employment was terminated. The following day, Local 15 filed two of the three grievances at issue in this case: No. 2005-386-NUP-BYR, which states, "Management denied employee unescorted access to plant. Union demands employee be made whole," and No. 2005-385-NUP-BYR, which states: "Management unjustly terminated employee, Union demands employee be made whole." After filing these grievances, McMahon appealed, via Exelon's internal procedures, the decision to deny him unescorted access rights. On April 15, 2005, McMahon was informed that Exelon's appeal reviewer upheld the denial. Local 15 then filed its third grievance, No. 2005-788-NUP-BYR, which states, "Employee appeal for access to plant unjustly denied." Local 15 and Exelon agreed to consolidate the three grievances. The consolidated grievances progressed through the CBA's grievance procedure without successful resolution and an arbitration hearing was scheduled. The arbitration was not held, however, because Exelon commenced the instant declaratory judgment action on December 15, 2006 seeking a declaration that its decision to deny McMahon unescorted access rights is not arbitrable. Local 15 counterclaimed to compel arbitration of the grievances it filed on behalf of McMahon.

---

access authorization for more than 365 days, and the grandfathering provisions thus became inapplicable. Consequently, he was required under NRC regulations to undergo psychological screening to secure unescorted access before reporting for work in 2005.

**DISCUSSION**

The dispositive issue in this case is whether Exelon's decision to deny McMahon unescorted site access is arbitrable.[2] Exelon argues that its decisions regarding unescorted access are not arbitrable because (1) the NRC mandates that its licensees make the final decision regarding denials of unescorted access and does not permit review of access denials to be arbitrated; and (2) alternatively, even if the NRC permitted arbitral review of its licensees' decisions to deny unescorted site access, arbitration is still precluded in this instance because the CBA does not explicitly provide that disputes involving such decisions are arbitrable. Local 15, on the other hand, argues (1) that NRC regulations do not prohibit arbitration of disputes involving its licensees' decisions to deny unescorted access, and (2) that arbitration must be

---

[2]As a preliminary matter, the court addresses Exelon's suggestion that Local 15 unnecessarily seeks to arbitrate the grievances involving the decision to deny McMahon unescorted site access and Exelon's internal review of that decision because Exelon is not opposed to arbitrating the unjust termination grievance. Exelon appears to argue that an arbitrator could still decide whether McMahon was unjustly terminated by asking the question whether "in light of Mr. McMahon's lack of access, the Company had an obligation to place him in another available position or otherwise allow him to stay on the payroll." *See* Exelon's Supplemental Mem. 3. This argument ignores, however, the fact that the arbitrator could never arrive at a determination that Exelon has any such obligation without first determining whether Exelon's access decision was improper; surely Exelon is not arguing that even if its decision to deny McMahon access was proper, it may still have an obligation to keep him on the payroll. As Exelon's sole reason for discharging McMahon was based on its decision to deny him unescorted access, declining to compel arbitration of the grievances addressing that decision would effectively prohibit an arbitrator from making a meaningful determination as to whether McMahon was terminated for cause. The court finds it necessary, therefore, to decide whether Local 15's grievances concerning Exelon's decision to deny McMahon site access are arbitrable.

5

compelled pursuant to the provisions of the parties' CBA and the federal policy favoring arbitration of labor disputes.[3]

## I. WHETHER THE NRC PROHIBITS ARBITRATION REGARDING EXELON'S DECISION TO DENY MCMAHON UNESCORTED SITE ACCESS.

The first issue is whether the NRC's regulations and requirements prohibit arbitration of denial of site access authorization. Exelon argues that such arbitration is prohibited by NRC regulations, industry guidelines that have been endorsed by the NRC, and Exelon's own access authorization program, which requires and has been granted NRC approval.

Exelon's argument begins with the NRC's requirement that its licensees, such as Exelon, establish an access authorization program. As courts have recognized, by enacting the Atomic Energy Act of 1954, 42 U.S.C. § 2011, and the Energy Reorganization Act of 1974, 42 U.S.C. § 5841, which established the NRC and transferred to it jurisdiction over the licensing of private nuclear power plants (which was formerly the domain of the Atomic Energy Commission), Congress intended that "[t]he federal government maintain[] complete control of the safety and 'nuclear' aspects of energy generation," by regulating safety issues concerning the construction and operation of nuclear power plants. *Pac. Gas and Elec. Co.* v. *State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 211–12, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983); *see also Pub. Serv. Elec. & Gas Co.* v. *Local 94 Int'l Broth. of Elec. Workers*, 140 F. Supp. 2d 384, 388 (D.N.J. 2001) (hereinafter "*PSE&G*"). In exercising such control, the NRC is authorized to prescribe regulations, including standards and restrictions governing the operation

---

[3] Because the court grants Local 15's motion for summary judgment, it need not address Local 15's alternative arguments that issues of arbitrability may be decided by an arbitrator under the operative CBA and that arbitration may be compelled based on the CBA's recognition and no-strike clauses.

of nuclear power plants, "in order to protect health and to minimize danger to life or property." 42 U.S.C.A. § 2201(i)(3); *Susquehanna Valley Alliance* v. *Three Mile Island Nuclear Reactor*, 619 F.2d 231, 235–36 (3d Cir. 1980).

Pursuant to NRC regulations, Exelon, like all commercial nuclear power plants licensees, must have an approved physical security plan that provides protection against radiological sabotage and unreasonable risk to the public health and safety. 10 C.F.R. § 73.55. In 1991, the NRC implemented 10 C.F.R. § 73.56, which requires that as part of their physical security plan, licensees establish and implement an "access authorization program." 10 C.F.R. § 73.56. The central purpose of the access authorization program requirement is to "provid[e] high assurance that individuals granted unescorted access are trustworthy and reliable, and do not constitute an unreasonable risk to the health and safety of the public including a potential to commit radiological sabotage." *Id.* § 73.56(b)(1).

The regulations set out specific elements that each licensee's access authorization program must include, including a background investigation, a psychological assessment, and behavioral observation. *Id.* § 73.56(b). The regulations further direct the licensee to "base its decision to grant, deny, revoke, or continue an unescorted access authorization on review and evaluation of all pertinent information developed." *Id.* § 73.56(b)(3).

Particularly relevant to the issues raised here, the regulations also require the licensee to include in its access authorization program "a procedure for the review, at the request of the affected employee, of a denial or revocation by the licensee of unescorted access authorization of an employee of the licensee . . . which adversely affects employment." *Id.* § 73.56(e). As Exelon emphasizes, "the regulations make clear that this review procedure 'may be an impartial

7

and independent internal management review.'"  Exelon's Mem. in Supp. of its Mot. for Summary Judgment at 8 (citing 10 C.F.R. §73.56(e)).  Exelon further points out that "[t]he regulations do not mention any other specific form of review, including review under a collectively bargained grievance procedure."  *Id.* at 8 (citing 10 C.F.R. §73.56(e)).

Nevertheless, it is also apparent that 10 C.F.R. §73.56 does not, by its own terms, prohibit review of an access denial pursuant to a collectively bargained grievance procedure, such as arbitration.  The regulatory history of the regulation, moreover, supports the conclusion that such procedures are permissible.  Indeed, upon issuance of 10 C.F.R. § 73.56, the NRC emphasized in its regulatory guide,

> In the comments on the proposed policy statement, concern was expressed that the review procedure required by the Guidelines did not sufficiently protect the worker's interests. . . .  It should be noted that *the Commission never intended that any review procedure that already exists in a bargaining agreement be abandoned*.

Access Authorization Program for Nuclear Power Plants, 56 Fed. Reg. 18,997, 19,002 (Apr. 25, 1991) (emphasis added); *see also PSE&G*, 140 F. Supp. 2d at 392 (quoting 56 Fed. Reg. at 19,006) ("[T]he Court finds the historical record persuasive that the NRC's intent was to permit an arbitration provision to be utilized as the appeal process for revocation or denial of site access authorization when appropriate, especially in consideration of the NRC's response that it was not its intent to 'exclude from consideration or to require consideration of access authorization issues in the collective bargaining process.'"); *id.* at 393 ("Not only has the NRC not expressly precluded arbitration to be the appeal procedure, but the language in the regulation contemplates it.").

Exelon further relies on the guidelines developed by the Nuclear Energy Institute ("NEI"), a consortium of nuclear power operators that represents the nuclear industry.  On

8

January 7, 2003, in the aftermath of the terrorist attacks of September 11, 2001, the NRC issued an Order ("the Order") to all licensees, requiring compliance with heightened safeguards and security measures. The specific additional security requirements, which were set forth as attachments to the Order, are designated "Safeguards Information" and, as such, are confidential except as allowed by federal regulation. In April 2004, the NEI issued comprehensive operational guidelines, known as "NEI 03-01," for the implementation of the Order's confidential requirements. The NRC approved NEI 03-01, which is not a confidential document, as an acceptable means for the industry to implement the Order and the existing regulations relevant to access authorization. NEI 03-01 requires that NRC licensees conduct a background investigation and a psychological assessment for each employee prior to granting him or her unescorted access.

Like 10 C.F.R. §73.56, the NEI's guidelines further require a licensee to have a procedure available to the affected individual for the review of a denial of access. Exelon argues that

> [t]he guidelines provide that the individual whose access is denied shall have the opportunity to have "the decision [denying his or her unescorted access], together with any additional information, reviewed by another designated management level employee . . . ." Significantly, NEI 03-01 further states that, "The determination from this review is final."

Exelon's Mem. in Supp. of its Mot. for Summary Judgment at 2. As Local 15 points out, however, NEI 03-01 further provides,

> An *alternative* review process that is independent and impartial is acceptable. The licensee shall include a description of the process to be used in the procedures that implement this requirement.

9

Exelon's Rule 56.1 Statement, Ex. 9 (NEI 03-01), at 31 (emphasis added). Indeed, this language immediately follows that quoted by Exelon ("The determination from this review is final.") from NEI 03-01. Exelon's insinuation that NEI 03-01 *mandates* that review of access denial decisions be conducted only by a designated Exelon manager and that such determinations *must* be considered final is simply not supported by the language of the guidelines. While NEI 03-01 undoubtedly allows for such a limited review mechanism, it also states emphatically that an *alternative* review process is acceptable.

Finally, Exelon cites the provisions of its own site access authorization program, SY-AA-103-500, 501, and 504. Exelon argues that, in accord with NEI 03-01 and the Order of January 7, 2003, these provisions provide for internal management review of a denial of unescorted access and mandate that "[t]he determination made by the Appeal Reviewer is final." Exelon's Mem. in Supp. of its Mot. for Summary Judgment at 3. Exelon explains that this program "was developed and implemented *unilaterally* by Exelon's Nuclear Security Department and has never been negotiated with Local 15" and that "[i]n early 2006, the NRC audited the Company's access authorization program and found that it satisfied the NRC's requirements." *Id.* at 3 (emphasis added).

Local 15 concedes that NEI 03-01 has been approved by the NRC and that Exelon is not free to modify that document. Local 15 argues, however, that Exelon's procedures "are *not independently* approved by the NRC"; rather, the union contends, the NRC "reviews the procedures when they audit. Exelon does not consult with the NEI when it drafts revisions and frequently revises policies." Reply in Supp. of Local 15's Mot. for Summary Judgment at 4–5.

At best, Exelon's arguments suggest that it has essentially tied its own hands by unilaterally developing, and then obtaining NRC approval of, an access authorization plan that does not allow for arbitration of denial of site access authorization. Exelon has failed, however, to cite any authority or evidence indicating that either the NRC's regulations or any other federal mandate (or even the industry-developed NEI guidelines) *require* Exelon's access authorization program plan to prohibit such arbitration.[4]

Exelon repeatedly emphasizes "the *fact* that . . . to the extent the licensee has a security plan that contains a review process and decision making process, the licensee cannot deviate from that process . . . *without the NRC's approval*." *See, e.g.*, Exelon's Resp. to Local 15's Mot. for Summary Judgment at 2 (internal quotation marks and citations omitted) (emphasis added); *accord id.* at 6. But Exelon has apparently not even attempted—much less sought the NRC's approval—to incorporate arbitration into the company's access authorization program. Moreover, if Exelon had done so, it is far from clear that the NRC would have rejected such a provision. The court must therefore reject Exelon's suggestion that its unilaterally-developed site access authorization plan, upon being audited and receiving approval from the NRC, took on the force of federal law and thus overrides other legal provisions, such as those contained in the CBA, that may otherwise obligate Exelon to submit to such arbitration.

---

[4] Indeed, far from prohibiting arbitration of site acess issues, the NRC regulations and NEI guidelines on which Exelon relies appear to allow for such arbitration to be incorporated into the access authorization programs of NRC licensees, such as Exelon. For purposes of this decision, however, the court need not go so far; it suffices to hold that none of the NRC requirements cited by Exelon prohibit the incorporation of such arbitration into its access authorization program.

For all of these reasons, the court finds that the NRC's regulations and requirements do not preclude disputes involving decisions to deny unescorted site access from being arbitrated pursuant to a collective bargaining agreement.

## II. WHETHER EXELON'S DECISION TO DENY MCMAHON UNESCORTED SITE ACCESS IS ARBITRABLE UNDER THE CBA.

The court must next determine whether the operative CBA provides for arbitration of disputes involving site access denial. The court finds that it does. The Seventh Circuit's recent decision in *Exelon Generation Co., LLC* v. *Local 15* (hereinafter "*Retiree Medical*") is controlling. No. 07-4065, 2008 U.S. App. LEXIS 18764, at *14 (7th Cir. Sept. 2, 2008). There, the Seventh Circuit upheld the district court's determination that a grievance involving a dispute over Exelon's changes to medical benefits for retirees was arbitrable under the same CBA and arbitration clause at issue in this case. *Id.* at *17. In doing so, the Seventh Circuit applied the presumption of arbitrability to the arbitration clause stating that "[w]here the arbitration provision is broad, as it is here, only an 'express provision excluding a particular grievance from arbitration . . . [or] the most forceful evidence of a purpose to exclude the claim from arbitration' can keep the claim from arbitration." *Id*. at *15 (quoting *AT&T Techs., Inc*. v. *Commc'ns Workers of Am.*, 475 U.S. 643, 650, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986)). In light of *Retiree Medical*, the court requested that the parties submit supplemental memoranda. In its supplemental memorandum, Exelon argues that *Retiree Medical* is "irrelevant to this matter." *See* Exelon's Supplemental Mem. at 1. The court disagrees.

First, Exelon argues that even though the Seventh Circuit has already determined that the same arbitration clause at issue in this case is "broad" and applied the presumption of arbitrability to it, the court should not do so here. Exelon seeks to distinguish *Retiree Medical*

12

from the instant case by arguing that the Seventh Circuit's determination that the dispute was arbitrable was based on the fact that the "CBA created the rights to [the] retiree medical benefits at issue." *Id.* at 3. This interpretation is not only inconsistent with Exelon's own position in *Retiree Medical*, it is simply incorrect.

The Seventh Circuit expressly found that "Exelon is correct that the mere fact that a CBA creates the retirees' rights to medical benefits may be insufficient to establish that the company agreed to arbitrate disputes over retiree medical benefits." *Retiree Medical*, 2008 U.S. App. LEXIS 18764, at *11–12. The Seventh Circuit then went on to distinguish the arbitration clause at issue from the one involved in *Rosetto* v. *Pabst Brewing Co.*, 128 F.3d 538, 540 (7th Cir. 1997), the case on which Exelon relied in arguing that the CBA only covers disputes between the company and employees, not retirees. As the Seventh Circuit made clear, the "critical distinction" between *Rosetto* and *Retiree Medical* was that the arbitration clause in the latter was "broader" and did not expressly define an arbitrable grievance as one between the company and an employee. *Id.* Thus, contrary to Exelon's present assertion, it was the breadth of the arbitration agreement and the applicability of the presumption of arbitrability to it, not the fact that the CBA created the rights at issue, which was determinative. *Id.* at *12.

Second, Exelon argues that public policy concerns over the safety and security of nuclear power, which it asserts are evident in the NRC regulations, prohibit the application of the presumption of arbitrability in this case. *See* Exelon's Supplemental Mem. at 2-3. The parties have not brought to the court's attention, nor does the court's independent research reveal, any circuit court cases applying (or, likewise, declining to apply) the presumption of arbitrability to grievances involving the denial of unescorted site access authorization. Exelon has cited and

13

urged the court to follow *PSE&G*, an opinion rendered by a magistrate judge sitting in the district court of New Jersey. *PSE&G* held that NRC regulations do not preclude site access issues from being arbitrated and that the use of arbitration as an appeal process for denials of site access is permitted. 140 F. Supp. 2d at 393. Nonetheless the magistrate judge refused to apply the presumption of arbitrability to the collective bargaining agreement at issue, concluding, without citation to authority, that the "importance of site access determinations warrants a separate, clear, and specific provision in the collective bargaining agreement if arbitration is to be the review process." *Id*. at 404.

The court declines to adopt the New Jersey district court's holding[5] that "public policy requires a clearly enunciated provision in the CBA that designates arbitration as an appeal procedure for site access determinations," *id*., because it is at odds with well-established and binding Supreme Court and Seventh Circuit precedents that find public policy favors arbitration. See, e.g. *United Steelworkers of Am.* v. *Warrior Gulf Navigation Co*., 363 U.S. 574, 582–83, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960) ("An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.") *Accord AT&T Techs.,* 475 U.S. at 650; *Retiree Medical*, 2008 U.S. App. LEXIS 18764, at *14 (same) (citing *Niro v. Fearn Int'l, Inc.*, 827 F.2d 173, 175 (7th Cir. 1987)).

---

[5] As the court reads it, the Third Circuit's non-precedential *per curiam* opinion affirming the lower court, No. 01-2147, 27 Fed. Appx. 127, 128 (3d Cir. January 31, 2002), is limited to its interpretation of the collective bargaining agreement in that case, which the lower court characterized as narrow, 140 F. Supp. 2d at 394–395. The Third Circuit's opinion does not appear to adopt or otherwise endorse the lower court's requirement that there be a clearly enunciated provision in the CBA before ordering arbitration of grievances involving disputes over site access denials.

*See also Moses H. Cone Mem. Hosp.* v. *Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983) ("The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."); *Int'l Bhd. of Elec. Workers, Local 21* v. *Ill. Bell Tel. Co.*, 491 F.3d 685, 687 (7th Cir. 2007) ("When resolving arbitrability disputes, a court must bear in mind the liberal federal policy in favor of arbitration agreements.") The court is also cognizant of arbitration decisions rendered after *PSE&G* concerning denial or revocation of site access. *See, e.g.*, *IBEW Local 1483* v. *Omaha Public Power Dist.,* FMCS Case No. 070112-52821-A (2007) (Graham, Arb.); *IBEW Local 1413* v. *First Energy*, FMCS Case No. 05-55280 (2006) (Graham, Arb.); *Southern Nuclear Operating, Co.* v. *Int'l Bhd. of Elec., Local Union No. 84*, 05-1 Lab Arb. Awards (CCH) P 3052 (2004) (Nolan, Arb.). Accordingly, mindful of the different issues at stake between *Retiree Medical* and the instant case, the court will apply the presumption of arbitrability to the grievances involving the denial of McMahon's site access and its internal review of that denial.

The Seventh Circuit has already determined that the operative arbitration clause is "quite broad" and that the presumption of arbitrability is therefore particularly applicable. *Retiree Medical*, 2008 U.S. App. LEXIS 18764, at *14–16. Furthermore, it is "susceptible of an interpretation that covers the asserted dispute." *Id*. at 14 (internal citations omitted).

Local 15 argues that the CBA provides for arbitration of disputes involving the denial of site access based on certain provisions of the CBA regarding systematic reductions in the work force and working conditions. Specifically, Local 15 cites to three identical paragraphs in the

CBA's "Reduction in Force" provisions concerning rebalancing of the work force after a reduction in Exelon's clerical, nuclear physical and commercial physical units:

> Management will determine the need to rebalance the work force as a result of implementing the provisions of this letter. Employees will be transferred on a volunteer basis in security order prior to reassignment to locations requiring additional staffing, provided they are able to perform the work and meet all qualifications, including testing requirements, all medical requirements, radiological requirements, requirements for unescorted access, and the Company's Fitness for Duty Access Authorization Programs as described in SY-AA-102 and SY-AA-103-500 must be met.

Based on this language, Local 15 appears to argue that Exelon's Fitness for Duty Access Authorization Programs are therefore incorporated into the CBA such that the disputes involving unescorted access denials concern "the interpretation or application of the provisions of the agreement." *See* Local 15's Reply in Supp. of its Mot. for Summary Judgment at 9-10. Exelon contends that this language constitutes nothing more than "passing references" to Exelon's access procedures and is therefore not "subject to any interpretation and application." *See* Exelon Resp. to Local 15's Mot. for Summary Judgment at 9.

Local 15 also points to the first paragraph of Article V of the CBA, entitled "Working Conditions", which states that Exelon "will continue its present policy of cooperating with its employees so as to insure that all reasonable rules and provisions are made for the safety and health of employees during the hours of their employment" and argues that unescorted access requirements are rules insuring the safety and health of employees. *See* Local 15's Mem. in Supp. of its Mot. for Summary Judgment at 8-9. Exelon disagrees, asserting that the overriding purpose of site access authorization requirements is "to ensure that individuals granted access are trustworthy and reliable and do not constitute an unreasonable risk to the *public* in general." Exelon Resp. to Local 15's Mot. for Summary Judgment at 9-10 (emphasis in original).

The court finds it unnecessary, however, to determine whether the language found in the "Reduction in Force" and "Working Conditions" sections of the CBA is sufficient to show that disputes involving the denial of site access involve "the interpretation or application of any of the provisions" of the CBA because such disputes may fairly be said to fall within the second part of the arbitration clause. The pertinent language, not discussed in *Retiree Medical*, provides that any disputes or differences with respect to "job working conditions," are also subject to arbitration. Furthermore, the arbitration agreement defines "working conditions" to include "those elements concerned with the hours when an employee is at work and *the acts required of the employee during such hours*."[6] (emphasis added). Exelon requires certain of its employees to work in unescorted access areas. Hence, having unescorted access authorization could be an element of the acts required by Exelon during work hours. The facts underlying the instant case support this interpretation: McMahon was terminated precisely because he was denied the unescorted site access authorization necessary to perform his duties. Accordingly, the court finds that site access may fairly be said to be an element concerned with the acts required of an employee during work hours.[7]

---

[6]The arbitration clause, found in Article VII of the CBA, defines the term "working conditions" as "those elements concerned with the hours when an employee is at work and the acts required of the employee during such hours" and does not refer to Article V of the CBA entitled "Working Conditions." Thus, the term "working conditions" as used in the arbitration clause in Article VII is not a defined term and does not appear to be limited by Article V.

[7]Although Local 15 does not clearly articulate an argument for this construction, it does argue that the grant or denial of access authorization is "a condition of work occurring after hire under the CBA." *See* Local 15's Reply in Supp. of its Mot. for Summary Judgment at 10. Exelon, on the other hand, makes no argument as to why decisions to grant or deny unescorted access could not be construed as elements concerned with the acts required of employees during work hours. *See, e.g.,* Exelon Resp. to Local 15's Mot. for Summary Judgment at 8.

Moreover, the CBA does not contain an express provision excluding from arbitration disputes involving site access denial. Exelon has not provided "forceful evidence" of a purpose to exclude such disputes because, as discussed above, the NRC regulations cited by Exelon do not prohibit arbitration of disputes involving the denial of site access. The court thus finds that it "cannot be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Warrior Gulf*, 363 U.S. at 582–83. Local 15's grievances concerning Exelon's decision to deny McMahon unescorted site acess are arbitrable.

## CONCLUSION

Having determined that the NRC regulations do not prohibit the arbitration of disputes involving the denial of site access, and that, applying the presumption of arbitrability, such a dispute falls within the scope of the arbitration agreement, Local 15 is entitled to compel arbitration on its grievances concerning Exelon's decision to deny McMahon unescorted site access and its subsequent review of that denial. *See Zurich Am. Ins. Co. V. Watts Indus., Inc.*, 466 F.3d 577, 580 (7th Cir. 2006) ("To compel arbitration, a party need only show: (1) an agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal by the opposing party to proceed to arbitration.").

## ORDER

For the foregoing reasons, Local 15's motion for summary judgment [#39] is granted, Exelon's motion for summary judgment [#44] is denied, and Local 15's motion to stay proceedings and compel arbitration [#38] is granted. The court hereby stays the case pending arbitration and directs the parties to proceed to arbitration pursuant to the terms of the CBA.

Dated: September 29, 2008    Enter: _____

JOAN HUMPHREY LEFKOW

United States District Judge