IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EXELON GENERATION COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff-Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Case No.: 06 C 6961 |
| | ) | |
| LOCAL 15, INTERNATIONAL | ) | Judge Lefkow |
| BROTHERHOOD OF ELECTRICAL | ) | |
| WORKERS, AFL-CIO, | ) | Magistrate Judge Valdez |
| | ) | |
| Defendant/CounterPlaintiff. | ) | |

## **LOCAL 15 INDEX TO EXHIBITS IN OPPOSITION TO RECONSIDERATION**

1.     Side by Side Comparison of Revision 56.(l) Review Procedures 3/27/09
   and former 56(e) Review Procedures

2.     NEI 03-01 April, 2004
   Nuclear Power Plant Authorization Program
   (Formerly Exhibit 8 to Union's Motion for Summary Judgment)
   Employer as NEI Author
   Page 2 Acknowledgements

3.     56 Fed Reg. 18997 (April 25, 1991)
   NRC Comments to CFR Access
   Authorization Review
   (Formerly Exhibit 10 to Union's Motion for Summary Judgment)

4.     <u>Dey v. Nuclear Regulatory Commission</u>
   2007 MSPB Lexis 4374 (6/19/07 vacating
   2006 MSPB Lexis 7006 (6/19/07)

                 LOCAL 15, INTERNATIONAL
                 BROTHERHOOD OF ELECTRICAL
                 WORKERS, AFL-CIO, Defendant

             By:    _____
                   One of Its Attorneys

John J. Toomey
ARNOLD AND KADJAN
19 W. Jackson Boulevard, Suite 300
Chicago, Illinois 60604
(312) 236-0415

# EXHIBIT 1

Revisions for
3/31/10
Compliance
Federal Register / Vol. 74, No. 58  **13985**

Prior
NRC
Regulations
Nuclear Regulatory Commission  § 73.56

(l) *Review procedures.* Each licensee and applicant shall include a procedure for the notification of individuals who are denied unescorted access, unescorted access authorization, or who are unfavorably terminated. Additionally, procedures must include provisions for the review, at the request of the affected individual, of a denial or unfavorable termination of unescorted access or unescorted access authorization that may adversely affect

employment. The procedure must contain a provision to ensure the individual is informed of the grounds for the denial or unfavorable termination and allow the individual an opportunity to provide additional relevant information and an opportunity for an objective review of the information upon which the denial or unfavorable termination of unescorted access or unescorted access authorization was based. The procedure must provide for an impartial and independent internal management review. Licensees and applicants shall not grant unescorted access or certify unescorted access authorization, or permit the individual to maintain unescorted access or unescorted access authorization during the review process.

(m) *Protection of information.* Each licensee, applicant, contractor, or vendor shall establish and maintain a system of files and procedures to ensure personal information is not disclosed to unauthorized persons.

(1) Licensees, applicants and contractors or vendors shall obtain signed consent from the subject individual that authorizes the disclosure of any information collected and maintained under this section before disclosing the information, except for disclosures to the following individuals:

(i) The subject individual or his or her representative, when the individual has designated the representative in writing for specified unescorted access authorization matters;

(ii) NRC representatives;

(iii) Appropriate law enforcement officials under court order;

(iv) A licensee's, applicant's, or contractor's or vendor's representatives who have a need to have access to the information in performing assigned duties, including determinations of trustworthiness and reliability and audits of access authorization programs;

(v) The presiding officer in a judicial or administrative proceeding that is initiated by the subject individual;

(vi) Persons deciding matters under the review procedures in paragraph (k) of this section; or

(vii) Other persons pursuant to court order.

(2) All information pertaining to a denial or unfavorable termination of the individual's unescorted access or unescorted access authorization shall be promptly provided, upon receipt of a written request by the subject individual or his or her designated representative as designated in writing. The licensee or applicant may redact the information to be released to the extent that personal privacy information, including the name

(e) *Review procedures.* Each licensee implementing an unescorted access authorization program under the provisions of this section shall include a procedure for the review, at the request of the affected employee, of a denial or revocation by the licensee of unescorted access authorization of an employee of the licensee, contractor, or vendor, which adversely affects employment. The procedure must provide that the employee is informed of the grounds for denial or revocation and allow the employee an opportunity to provide additional relevant information, and provide an opportunity for an objective review of the information on which the denial or revocation was based. The procedure may be an impartial and independent internal management review. Unescorted access may not be granted to the individual during the review process.

(f) *Protection of information.* (1) Each licensee, contractor, or vendor who collects personal information on an employee for the purpose of complying with this section shall establish and maintain a system of files and procedures for the protection of the personal information.

(2) Licensees, contractors, and vendors small make available such personal information to another licensee, contractor, or vendor provided that the request is accompanied by a signed release from the individual.

(3) Licensees, contractors, and vendors may not disclose the personal information collected and maintained to persons other than:

(i) Other licensees, contractors, or vendors, or their authorized representatives, legitimately seeking the information as required by this section for unescorted access decisions and who have obtained a signed release from the individual.

(ii) NRC representatives;

(iii) Appropriate law enforcement officials under court order;

(iv) The subject individual or his or her representative;

(v) Those licensee representatives who have a need to have access to the information in performing assigned duties, including audits of licensee's, contractor's, and vendor's programs;

(vi) Persons deciding matters on review or appeal; or

(vii) Other persons pursuant to court order. This section does not authorize the licensee, contractor, or vendor to withhold evidence of criminal conduct from law enforcement officials.

# EXHIBIT 2

**NEI 03-01 [Revision 1]**

# Nuclear Energy Institute

# Nuclear Power Plant Access Authorization Program

**April 2004**



EXHIBIT

*Nuclear Energy Institute, 1776 I Street N.W., Suite 400, Washington D.C. (202.739.8000)*

## ACKNOWLEDGEMENTS

This document, *Nuclear Power Plant Access Authorization Program*, NEI 03-01, was developed by members of the NEI Access Authorization Control Standardization Task Force. These industry professionals, experts on access authorization programs, drawing upon practical lessons learned during the application of the previous requirements, provided valuable insights to update the program. The changes provide a more efficient and effective program. NEI also wishes to acknowledge the extensive review and comment by those industry representatives who shaped the final form of this document:

David J. Bonthron (Florida Power & Light Company)
Kathleen E. Burkett (American Electric Power)
Ronald L. Casey (Entergy Operations, Inc.)
Randall D. Cleveland (Nuclear Management Company, LLC)
Dennis M. Dean (Constellation Energy Group)
Peter J. Defilippi (Westinghouse)
Nickolas J. DiPietro (FirstEnergy Corporation)
Sherry J. Eckert (Rochester Gas & Electric Corporation)
W. Marty Flannery (Southern California Edison Company)
Peter R. Fowler (Duke Energy)
Lori Hayes (Progress Energy)
Bonnie Schnetzler (Tennessee Valley Authority)
Joseph F. Slike (FirstEnergy Corporation)
Susan C. Techau (Exelon Corporation)
Janet J. Thiel (South Carolina Electric & Gas Company)
Kay E. Wallace (Tennessee Valley Authority)
Maudester Woodard-Hall (STP Nuclear Operating Company)

## NOTICE

Neither NEI, nor any of its employees, members, supporting organizations, contractors, or consultants make any warranty, expressed or implied, or assume any legal responsibility for the accuracy or completeness of, or assume any liability for damages resulting from any use of, any information apparatus, methods, or process disclosed in this report or that such may not infringe privately owned rights.

NEI 03-01 (Revision 1)
April 2004

## EXECUTIVE SUMMARY

NEI 03-01, *Nuclear Power Plant Access Authorization Program*, provides standard industry criteria for implementing the Access Authorization Rule and to establish consistency in access authorization programs throughout the industry in the implementation of the NRC-issued *Order for Compensatory Measures Related to Access Authorization*. With a decade of experience with previous NEI guidelines, several lessons have been incorporated to maintain the industry programs that provide high assurance that only trustworthy and reliable people will be allowed into protected areas of nuclear power plants.

These updated performance criteria are consistent with most current industry practices and have the potential for increased program efficiency. Additionally, NEI 03-01 is organized to facilitate the sharing of access data among authorized entities through the Personnel Access Data System.

NEI 03-01, Revision 1, incorporates NRC access authorization program requirements and implements individual licensee security plan access authorization commitments. Separately, licensees are committed through the PADS Participation Agreement to follow NEI 03-01 Revision 1

NEI 03-01 (Revision 1)
April 2004

For an individual denied access prior to the implementation date, a consent form is not required for a licensee to share denial information required by the **AA CM**. This includes an individual who has had UAA restored after completing rehabilitation or other appropriate corrective action after an access-denial. Information to share includes:

- Date UA denied
- Company holding the "additional information"

If an individual's access was restored at some later date, licensees shall ensure that the most current UA information is also listed. This information is needed to clearly establish those individuals in a currently access-denied status.

For individuals denied access after the implementation date:

- Date access denied
- UA terminated unfavorably if individual held UA
- Company holding "additional information"
- Notification of all other licensee at which UA is actively held.

Individuals currently denied access are not allowed in the protected area except under conditions specified in Section 12.7 in this document.

## 12.5 INDIVIDUAL IN A FITNESS-FOR-DUTY FOLLOW-UP PROGRAM

Licensees shall include the follow-up information regarding all persons in an unescorted access authorization status, including the date the follow-up commenced and the date the follow-up is expected to end.

Information required includes:

- Date action taken
- Date follow-up program is scheduled to end
- That "additional information" is held by the licensee
- Company holding the "additional information"

## 12.6 ACCESS-DENIAL REVIEW PROCESS

The licensee shall have a review process that provides an individual whose UAA/UA is denied the capability to:

1. Be provided the basis for denial or revocation of UAA/UA;

2. Have the opportunity to provide any additional information; and

3. Be provided the opportunity to have the decision, together with any additional information, reviewed by another designated management level employee of the licensee who is equivalent or senior to and independent of the individual

NEI 03-01 (Revision 1)
April 2004

who made the initial decision to deny or terminate unfavorably UAA/UA. The determination from this review is final.

4.  An alternative review process that is independent and impartial is acceptable. The licensee shall include a description of the process to be used in the procedures that implement this requirement. Licensee programs are not intended to modify, subjugate, or abrogate any review rights that currently exist for C/V employees with their respective employers.

## 12.7 INDIVIDUALS CURRENTLY DENIED ACCESS

Persons currently denied access at a licensee facility will not be allowed in the protected area of any licensee facility, except under the following conditions:

1.  The denying licensee reviews the access decision and determines after further review, that an unescorted access authorization is appropriate.

2.  Another licensee reviews the conditions under which the denying licensee made the denial decision, and determines the individual is now trustworthy and reliable and fit for duty, and that unescorted access would be appropriate at the current licensee site.

The intent is to meet either condition 1 or 2 above, not both.

## 12.8 PROGRAM RELIABILITY

Licensees shall ensure that any violation of a 10 CFR Part 26 program element at one licensee is identifiable to all licensees, to the extent that, at the time of the discovery, persons holding unescorted access who were the subject of or included in, any program element violation at any licensee, are identified by that licensee, to any licensee where that person holds unescorted access.

If, for any reason, the shared information used for UAA/UA determinations changes, a licensee shall update the information available to other licensees. If the changes are significant enough to affect UAA/UA determinations, each licensee site where the affected individuals have current UAA/UA must be informed.

This requirement applies to both the access authorization and fitness-for-duty elements of the program. If issues arise that affect the background investigation of an individual, or group of individuals the licensee would take appropriate action to correct the deficiency. This may require withdrawing UAA/UA or correcting some investigation element. The intent of this section is to ensure that when this is necessary, other licensees relying on the shared information are also informed so they can take appropriate action. Correcting the shared information ensures that future UAA/UA decisions are based on valid information.

# EXHIBIT 3

LEXSEE 56 FED REG 18997

NUCLEAR REGULATORY COMMISSION

AGENCY: Nuclear Regulatory Commission.

10 CFR Part 73

Access Authorization Program for Nuclear Power Plants

RIN 3150-AA90

56 FR 18997

April 25, 1991

ACTION: Final rule.

SUMMARY: The Nuclear Regulatory Commission (NRC) is amending its regulations to require an access authorization program for individuals requiring unescorted access to protected and vital areas at nuclear power plants. These amendments require an access authorization program that consists of three elements: Background investigation, psychological assessment, and behavioral observation. The required elements of the program have long been practiced in varying degree by most licensees as part of their Physical Security Plans. The Commission is adopting this final rule to provide increased assurance that the likelihood that unescorted access to protected and vital areas will be given to individuals whose background, psychological profile, or changes in behavioral pattern indicate a potential for committing acts that are, or could be, detrimental to the public health and safety will be minimized. These amendments, which will affect all nuclear power plant licensees, will result in high assurance that personnel granted unescorted access to protected and vital areas of nuclear power plants are trustworthy and reliable and do not pose a threat to commit radiological sabotage.

EFFECTIVE DATE: May 28, 1991 except for the information collection requirements contained in §§ 73.56(a) (1), (2), and (3), (b) (1) and (2), (c), (d), (e), (f) (1) and (2), and (h)(1). These information collection requirements will become effective upon OMB approval. The NRC will publish a notice of the effective date in the Federal Register.

ADDRESSES: The regulatory guide associated with the rule and the final regulatory analysis which includes cost-benefit analysis for the rule are available for inspection at the Commission's Public Document Room, 2120 L Street NW., (Lower Level), Washington, DC 20037. Requests for single copies of regulatory guides or for placement on an automatic distribution list for single copies of future draft guides in specific divisions should be made in writing to the U.S. Nuclear Regulatory Commission, Washington, DC 20555, Attention: Distribution Section, Division of Information Support Services. Telephone requests cannot be accommodated. Regulatory guides are not copyrighted, and Commission approval is not required to reproduce them.

FOR FURTHER INFORMATION CONTACT: Dr. Sandra D. Frattali, Division of Regulatory Applications, Office of Nuclear Regulatory Research, U.S. Nuclear Regulatory Commission, Washington, DC 20555, telephone (301) 492-3773; for information of a legal nature, contact Robert L. Fonner, Office of the General Counsel, U.S. Nuclear Regulatory Commission, Washington, DC 20555, telephone (301) 492-1643.

observers and that they need to be provided with proper training, including refresher training, in order to be effective. While the Commission agrees that supervisors are not psychologists, the behavioral observation program is necessary. The Commission believes that with training, as provided for by the Guidelines, supervisors can be good observers. Furthermore, the final decision concerning access authorization will be made not by the supervisor but by higher level management in conjunction with a qualified psychologist or psychiatrist if a new psychological assessment is made.

Other commenters expressed the opinion that the behavioral observation program would not be useful for temporary employees as there is not enough continuity to provide meaningful observation. These commenters wanted the policy to clearly permit the utility to use a contractor's or vendor's behavioral observation program. The Commission believes that the behavioral observation program is useful in detecting long term patterns and impairments, as well as in evaluating recent behavior changes, and therefore, it is useful. The Commission believes that the details of how this program is implemented can be left to the discretion of the utility whose responsibility it is to determine whether to grant the unescorted access.

Finally, one commenter commented that the requirements that the person having unescorted access authorization must be notified of his/her responsibility to report any arrest that may impact upon his/her trustworthiness may not be legal. In addition, the commenter commented that, as worded, this section also implies that the individual has the responsibility of determining whether the arrest impacts upon his/her own trustworthiness. The Commission notes, however, that, as a condition of employment, requiring reporting of arrests is not unusual, and this requirement is retained in the program. After the arrest is reported, it will be evaluated as to how it will affect the individual's continued access authorization.

II. Exceptions to the NUMARC Guidelines

The rule explicitly differs from the Guidelines in two areas: The review procedure, and the grandfathering of existing access authorizations. In these instances the rule overrides the provisions of the Guidelines as recognized in the regulatory guide.

*II.1 Review Procedure*

In the comments on the proposed policy statement, concern was expressed that the review procedure required by the Guidelines did not sufficiently protect the worker's interests. The review (appeal) procedure included in the proposed rule was preferred. The language of the Guidelines in Revision 8, which was published with the proposed policy statement, provided for a minimal review procedure or any "alternative process which is independent and impartial." It should be noted that the Commission never intended that any review procedure that already exists in a bargaining agreement be abandoned. The current version of the Guidelines, Revision 89-01, August 1989, does clarify this.

However, the Commission has decided to retain the requirement for the review procedure in the rule itself. The review procedure in the Guidelines extends only to "permanent employees of the utility." The rule requires licensees to provide, at the request of the affected employee, a procedure for the review of a denial or revocation of access authorization which adversely affects employment of a permanent, as well as temporary, employee of the licensee, contractor, or vendor. The procedure must provide the individual information on the grounds for the denial or revocation and an opportunity for an objective review of the information in which the denial or revocation was based. However, unescorted access may not be granted during the review process.

A similar review procedure that was included in the proposed rule elicited several strong comments from electrical generating utilities with nuclear power reactors. The comments were uniformly negative, and made three main points: (1) The Commission has no authority to promulgate a review requirement in conjunction with the access authorization

rule, (2) the review requirement is not necessary because aggrieved employees have other recourse under existing law, and (3) the review procedure intrudes upon licensee's management prerogatives. Most of the utilities simply stated their objections without elaboration. Edison Electric Institute, on the other hand, submitted an extensive brief in support of the utilities' position.

The Edison Electric Institute brief relied principally upon *Jackson v. Metropolitan Edison Company,* 419 U.S.C. 345 (1974), for the proposition that the Commission has no authority to require a review procedure. In that case, the Court established the principle that there had to be a sufficiently close nexus between the state and the action of the regulated utility before the latter could fairly be viewed as state action requiring due process protection. Of considerable importance is whether the government put "its own weight on the side of the proposed practice by ordering it." Id. at 357. The industry argues, "At bottom, there is no state action involved because the government does not compel action against any employee; it only compels the employer to establish a framework for making its own assessments about its employees."

The Commission need not resolve whether, under this access authorization program, licensee decisions on access would be regarded as governmental action requiring due process protection, because the Commission does not base the requirement for review procedures on a need to comply with constitutional due process requirements. Rather, the Commission sees the review procedures required by the rule as necessary to assure effective access monitoring by licensees. Therefore, the Commission has authority to impose these procedures because they will further the safety interests addressed by the access rule.

The effectiveness of the program will depend on the accuracy of the information that forms the basis for access authorization decisions and on the perception of the licensee's employees that the program is a fair one worthy of their cooperation. The review procedures mandated by the rule are responsive to both these concerns. They provide a necessary additional assurance that where access is denied there is a sound basis for the decision and that mistaken access denials, which could undermine the quality of a licensee's work force and thereby counter the interests of safety, will not stand uncorrected. Furthermore, the use of even-handed fact-finding procedures, irrespective of due process clause considerations, should assure both the appearance and substance of fairness, which the Commission believes are necessary for an effective program.

In the Commission's view, it is not sufficient reason to dispense with the review procedures simply because there are other remedies that are available to the aggrieved person. Although in theory an aggrieved individual could commence an action in a State or a Federal court, such litigation could be costly and time-consuming for the average employee. In addition, the Commission has not seen evidence that union collective bargaining agreements (where they exist) would automatically include denial or revocation of access authorization as a grievable action. In any case, the latter would not be available in nonunion plants. Further, if procedures under collective bargaining agreements are readily available for this purpose in the absence of a required review procedure, as the Edison Electric Institute argues, there is no basis for objection to the review portion of the rule in unionized plants, since the rule would allow the use of a grievance procedure for review of denials or revocations of access authorizations.

Several other comments on the portion of the rule requiring a review procedure did not address basic questions of authority and necessity but rather the form of the rule itself. The comments and the response thereto follows.

A third party (i.e., an independent adjudicator) should not be deciding disputes over access authorization. An independent adjudicator could allow access to the plant to a person whom the utility management believes may present a serious threat to plant security. The Commission notes that the required review procedure applies only to employees denied access authorization on the basis of the program elements in the rule itself. The rule does not preclude utility management from denying access to an employee for reasons not subsumed under the mandated program. In addition, if the evidence indicates a proper application of relevant criteria in excluding an employee, the review procedure, if utilized, should result in a decision vindicating the management action.

searches, enhanced access controls into areas retained as vital, establishment of alternative access requirements) would likely be extensive and could vary dramatically depending on a number of factors including number of workers involved, extent of devitalization, and length and nature of the plant outage. The licensee would also be expected to demonstrate that adequate measures will continue to be in place to protect new and spent fuel that is onsite. Nonetheless, the Commission believes it is possible to evaluate the adequacy of a licensee's site-specific compensatory measures. Therefore, the provision included in the rule allows conditional relaxation of unescorted access during could shutdown on a case-by-case basis. The provision requires the licensee who chooses to implement such relaxation to develop and incorporate into their Physical Security Plans such compensatory measures.

It is the Commission's view that there may be special circumstances where the use of relaxed access requirements and compensatory measures will be a preferable approach. Under most circumstances, the existing options of the access authorization program provide sufficient flexibility for site access. The Commission expects that the option to relax access requirements during cold shutdown will only be exercised during major outages where there is substantial work requiring extensive use of temporary workers. Under these circumstances the licensee would likely have to do extensive functional testing of equipment following the outage for both operational and security purposes.

*III.8 Records and Protection of Information*

Clarification as to how long records need to be retained was requested. The Commission is requiring a record retention period of 5 years beyond termination of employment or denial of access.

One commenter pointed out that the documentation of the criminal history check is maintained by the licensee and that this should be specifically stated in the Guidelines. The Commission notes this is already stated in 10 CFR 73.57, and it has been added to the Guidelines.

Concerns about protection of information required by this program were expressed, even though it was addressed in the Guidelines. Protection of information is explicitly required by the rule and the situations under which information can be released are specified.

IV. General

*IV.1 Relationship to Fitness for Duty*

The labor union commenters expressed concerns about the random drug testing program. These comments supported the behavioral observation program because it included observation for substance abuse and, implicitly, drug testing for cause as opposed to random drug testing which the union did not support. The Commission notes drug testing is not part of the access authorization rule. The requirements for drug testing are contained in 10 CFR Part 26, Fitness for Duty Programs. The common element in the two programs is the behavioral observation program. There are no conflicting requirements.

*IV.2 Standardization of Requirements*

The commenters stressed the importance of standards being consistent throughout the industry. One contractor stated that meeting the standards in the Guidelines should be sufficient for unescorted access to any utility. The Commission intends to establish minimum criteria for a licensee's program for allowing unescorted access to a nuclear power plant in the rule and to endorse the NUMARC Guidelines (with exceptions as noted in the regulatory guide) as an acceptable means of implementing the rule. The ultimate responsibility for granting unescorted access rests with the licensee, provided the Commission's requirements are met.

*IV.3 Failure to Include the Bargaining Unit*

The labor unions who commented expressed concern that the Guidelines were developed without input from the bargaining unit or any worker representatives. The unions believed that issues involved in granting access authorization were conditions of employment and as such should be subject to the collective bargaining process. Having the policy statement published in proposed form allowed them and other interested parties to comment and make their opinions known. It is not the intent of the Commission to exclude from consideration or to require consideration of access authorization issues in the collective bargaining process as long as the resolution of these issues is within the limits set by this rulemaking.

*IV.4 Responsibility for Revisions to the Guidelines*

Many commenters made the point that the Guidelines are NUMARC's and the responsibility for revision remains with NUMARC. This is true. The regulatory guide will endorse only a specific version of the Guidelines, namely Revision 89-01, August 1989. Any changes NUMARC might subsequently make in the Guidelines would not be a part of the regulatory guide. This would not, however, preclude future changes to the regulatory guide or the licensees' commitment to such changes if they do not decrease the effectiveness of the physical security plan under the provisions of 10 CFR 50.54(p).

Environmental Impact: Categorical Exclusion

The NRC has determined that this rule is the type of action described in categorical exclusion 10 CFR 51.22(c)(3). Therefore, neither an environmental impact statement nor an environmental assessment has been prepared for this final rule.

Paperwork Reduction Act Statement

This final rule amends information collection requirements that are subject to the Paperwork Reduction Act of 1980 (44 U.S.C. 3501 et seq.). These requirements will become effective only after they have been approved by the Office of Management and Budget. Notification of OMB approval will be published in the Federal Register.

Because all licensees presently have an access authorization program in their Physical Security Plans, the actual public reporting burden for this collection of information is estimated to average a one time burden of 404 hours per response the first year and an annual incremental burden of 161 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Information and Records Management Branch (MNBB-7714), U.S. Nuclear Regulatory Commission, Washington, DC 20555; and to the Desk Officer, Office of Information and Regulatory Affairs, NEOB-3019, (3150-0002), Office of Management and Budget, Washington, DC 20503.

Regulatory Analysis

The Commission has prepared a regulatory analysis on this final regulation. The analysis examines the costs and benefits of the alternatives considered by the Commission. The analysis is available for inspection in the NRC Public Document Room, 2120 L St. NW. (Lower Level), Washington, DC 20037. Single copies of the analysis may be obtained from Dr. Sandra Frattali, U.S. Nuclear Regulatory Commission, Washington, DC 20555, (301) 492-3773.

# EXHIBIT 4



1 of 1 DOCUMENT

Monideep K. Dey, Appellant, v. Nuclear Regulatory Commission, Agency.

Docket No. DC-0432-07-0132-I-1

MERIT SYSTEMS PROTECTION BOARD

2007 M.S.P.B. 160; 106 M.S.P.R. 167; 2007 MSPB LEXIS 4374

June 19, 2007

**SUBSEQUENT HISTORY:**
On remand at Dey v. NRC, 2007 MSPB LEXIS 7251 (M.S.P.B., Dec. 17, 2007)

**PRIOR HISTORY:**
Dey v. NRC, 2006 MSPB LEXIS 7136 (M.S.P.B., Dec. 6, 2006)

**COUNSEL:**
[***1]

Monideep K. Dey, Potomac, Maryland, Pro se.

John S. Farrington, Esquire, Olney, Maryland, for the agency.

**OPINION BY:** SHANNON

**OPINION:**

[**168] **BEFORE**

Neil A. G. McPhie, Chairman

Mary M. Rose, Vice Chairman

Barbara J. Sapin, Member

**OPINION AND ORDER**

[*P1] The appellant has filed a petition for review (PFR) of the December 6, 2006 initial decision (ID) that dismissed his appeal without prejudice to refiling. For the reasons set forth below, we GRANT the appellant's PFR, VACATE the ID, and REMAND the case for further proceedings consistent with this Opinion and Order.

BACKGROUND

[*P2] On October 20, 2006, the agency removed the appellant from the GG-15 position of Senior Reliability and Risk Engineer. The agency based the removal on the appellant's unacceptable performance under 5 U.S.C. Chapter 43.

2007 M.S.P.B. 160, *P2; 106 M.S.P.R. 167, **168;
2007 MSPB LEXIS 4374, ***1

Initial Appeal File (IAF), Tab 1. After the appellant filed a petition for appeal (PFA) of the removal, *id.*, Tab 1, the administrative judge (AJ) issued an order proposing to dismiss the appeal without prejudice to refiling, *id.*, Tab 4. The appellant objected to the proposed dismissal. IAF, Tab 5.

[*P3]  The AJ nonetheless dismissed the appellant's PFA of his removal without prejudice [***2] to refiling. ID at 1, 3. She found that the agency had separately removed the appellant, also on October 20, 2006, under 5 U.S.C. Chapter 75 for misconduct; that the appellant had elected to ask the National Treasury Employees Union (NTEU) to appeal the conduct removal pursuant to arbitration procedures; and that NTEU had agreed to take the matter to arbitration. *Id.* at 1-2. She found that an arbitration decision "could effectively moot" the current appeal [**169] and, thus, that it was appropriate to dismiss the current appeal, pending a final arbitration decision, "in the interest of judicial efficiency and economy." *Id.* at 2. She found that, even if the appellant prevailed in the current appeal, he would not be reinstated unless and until his reinstatement was ordered in his conduct removal appeal. *Id.* at 2-3. She acknowledged the appellant's speculation that his conduct removal appeal could also be dismissed without prejudice. She noted, however, that the conduct removal appeal was filed before the current appeal. She found that, since she was dismissing the current appeal, it was unlikely that the conduct removal appeal would be dismissed pending a decision in this appeal. [***3] *Id.* at 3. She also found that the appellant's security clearance had been revoked on October 25, 2006; that a security clearance was a requirement of his position; and, thus, that it was even less likely that he would be harmed by delaying the current appeal. *Id.* at 3. The AJ ordered the agency to notify her when a final arbitration decision had been issued in the conduct removal appeal, "at which time the appellant's performance removal appeal will be reinstated." *Id.* at 3.

[*P4]  The appellant has filed a petition for review (PFR). PFR File, Tab 1. The agency has filed a response opposing the PFR. *Id.*, Tab 3.

ANALYSIS

[*P5]  The appellant argues that the AJ abused her discretion in dismissing his appeal. He states that his appeal is within the Board's jurisdiction and timely, and asserts that the dismissal denied him his statutory right to a hearing and review. He notes the AJ's admission that the Board decisions she cited for support did not involve the "very unusual" circumstances of his case, but rather situations where the agency took a second removal action while the first one was proceeding before the Board. He asserts that, although NTEU has agreed [***4] to take the conduct removal appeal to arbitration, the case is in abeyance "pending consideration of several matters." PFR at 4. He claims that NTEU wants the current appeal completed first "to maximize benefit of the arbitration proceedings." *Id.* He states that, therefore, neither of his appeals is presently being processed. He contends that the AJ's "judicial efficiency" rationale does not apply where both cases are not before the Board because the Board has no control of the proceedings at arbitration and the result is "judicial stagnation." *Id.*

[*P6]  The agency responds that the appellant has not met the standard for showing that the AJ abused her discretion in dismissing his appeal. PFR Resp. at 3. It argues that a dismissal without prejudice does not deny the appellant any statutory rights because the AJ ordered it to notify the Board when a final arbitration decision is issued in the conduct removal case so that the current appeal can be [**170] reinstated. *Id.* at 3. It states that the appellant has offered no evidence to show that the arbitration is not being processed and cited nothing requiring the AJ to adhere to any NTEU preference to have the current appeal adjudicated [***5] first. *Id.* at 3-4. It argues that the Board has dismissed cases without prejudice pending decisions and actions that are not before the Board on appeal. *Id.* at 4-5. It contends that judicial economy clearly supports the ID. *Id.* at 5-6. It further contends that the appellant suffers no harm from the dismissal because he would not be entitled to reinstatement or back pay even if he prevailed in the current appeal. In that regard, it contends that the misconduct removal bars the appellant's reinstatement until it is arbitrated and, in any event, the appellant has been placed on indefinite suspension without pay due to the suspension of his security clearance since all positions at the agency require a security clearance. *Id.* at 6.

[*P7]  In *Milner v. Department of Justice,* 87 M.S.P.R. 660, P13 (2001), the Board reiterated its previous holding

that the dismissal of a case without prejudice to its refiling was an option left to the sound discretion of the AJ. It held further, however, that this discretion was to be exercised in a manner consistent with the policies stated in that decision. *Id.* Those policies include that of deciding [***6] appeals within 120 days after their filing dates, to the extent practicable, and of acting in a manner consistent with the purpose of this goal, i.e., consistent with the purpose of benefiting the appellants by preventing delays that adversely affect them. *See id.,* P 10. The Board noted further that the 120-day goal was to be applied in a manner "consistent with the interests of fairness and other priorities of the Board." *Id.*

[*P8]  We agree with the appellant that a dismissal without prejudice was inappropriate in this case. First, it was improper to allow the refiling date to be solely contingent on the issuance of a final arbitration decision. Dismissal without prejudice should avoid open-ended periods for resolving appeals and should instead set a date certain by which the appellant must file an appeal. *E.g., Selig v. Department of the Army,* 102 M.S.P.R. 189, PP6-7 (2006); *Schulte v. Department of the Air Force,* 100 M.S.P.R. 141, P6 (2005).

[*P9]  Second, under the facts of this case, we find that a dismissal without prejudice is inappropriate even if the ID was modified to set a date certain for refiling. [***7]  Granted, as the agency argues, the appellant may not be entitled to back pay and reinstatement even if he prevails in the current appeal. The appellant asserted in his PFA, however, that the agency's action in this case was reprisal for protected whistleblowing. IAF, Tab 1. He also specifically requested an award of consequential damages in connection with his whistleblower claim. *Id.* Therefore, the AJ erred in finding that an arbitration decision [**171]  "could effectively moot" the current appeal because the appellant may still be able to obtain relief such as consequential damages or referral to the Office of Special Counsel if he were able to prove his whistleblower claim. *See Perry v. Department of Veterans Affairs,* 81 M.S.P.R. 298, P10 (1999); *cf. Walton v. Department of Agriculture,* 78 M.S.P.R. 401, 403-04 (1998) (stating that an individual-right-of-action appeal is not rendered moot when the agency completely rescinds the personnel action at issue if the appellant still has outstanding claims for consequential damages and corrective action).

[*P10]  In that regard, we find inapposite the Board decisions cited by the [***8] agency to show that the Board has dismissed cases without prejudice pending decisions and actions that are not before the Board and over which the Board has no control. Those Board decisions generally involve dismissals pending completion of criminal proceedings and retirement matters. PFR Resp. at 5. The delay at issue here would not provide the same kinds of benefits to the appellant. *See Wilson v. Department of Veterans Affairs,* 102 M.S.P.R. 70, P12 (2006); *Hodges v. Office of Personnel Management,* 101 M.S.P.R. 212, P14 (2006). The agency also cited *Schulte,* 100 M.S.P.R. 141, for the proposition that the Board may dismiss without prejudice an indefinite suspension appeal based on revocation of a national security clearance pending completion of an internal agency appeal and decision on revocation of the security clearance. In *Schulte,* however, the Board and agency appeals involved the same factual situations. *Id.,* P 2. Here, as the appellant points out, IAF, Tab 5, the current appeal and his conduct removal appeal involve totally different charges, *id.,* Tabs 1, 3. Moreover,  [***9]  there is no indication that Schulte raised a whistleblower claim, as the appellant did here. Resolution of the conduct removal appeal, therefore, will not resolve the issues in this case. *See, e.g., Wilson,* 102 M.S.P.R. 70, P13.

ORDER

[*P11]  For the reasons stated above, we find that the dismissal of this appeal without prejudice is inconsistent with the Board's policies and that it accordingly constitutes an abuse of discretion. The ID is VACATED and the case is REMANDED for adjudication.

FOR THE BOARD:

Matthew D. Shannon
Acting Clerk of the Board
Washington, D.C.

2007 M.S.P.B. 160, *P11; 106 M.S.P.R. 167, **171;
2007 MSPB LEXIS 4374, ***9

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Civil ProcedureAlternative Dispute ResolutionArbitrationsGeneral OverviewGovernmentsFederal
GovernmentDomestic SecurityGovernmentsLegislationStatutory Remedies & Rights



LEXSEE

MONIDEEP K. DEY, Appellant, v. NUCLEAR REGULATORY COMMISSION,
Agency.

DOCKET NUMBER DC-0752-06-0879-I-1

MERIT SYSTEMS PROTECTION BOARD

2006 MSPB LEXIS 7006

December 20, 2006

**SUBSEQUENT HISTORY:**
Review denied by Dey v. Nrc, 2007 MSPB LEXIS 7817 (M.S.P.B., June 19, 2007)

**COUNSEL:**
[*1]

Monideep K. Dey, Potomac, Maryland, Pro se.

John S. Farrington, Esquire, Olney, Maryland, for the agency.

**OPINION BY:** HUDSON

**OPINION:**

**BEFORE**

Michelle M. Hudson

Administrative Judge

**INITIAL DECISION**

On September 21, 2006, the appellant, a former Senior Reliability & Risk Engineer, GG-0840-15, filed an appeal from the agency's action indefinitely suspending him effective August 22, 2006, because his access authorization (national security clearance) and his employment clearance were suspended. n1 For the reasons that follow, the agency's action is AFFIRMED.

> n1 The agency subsequently removed the appellant (in two separate actions, both effective the same date) based on unacceptable performance and misconduct, effective October 20, 2006. His security clearance was subsequently revoked effective October 25, 2006. *See* AF, Tab 17, Agency's Prehearing Submissions, Exhibit 6. The appellant appealed the removal action based unacceptable performance to the Board. *See* MSPB Docket No. DC-0432-07-0132-I-1 (Initial Decision December 6, 2006). The performance removal appeal was dismissed without prejudice pending a final arbitration decision in the misconduct removal action. The appellant

additionally filed a separate appeal from the agency's decision to revoke his security clearance, which was dismissed for lack of Board jurisdiction. *See* MSPB Docket No. DC-3443-07-01-4-I-1 (Initial Decision, December 7, 2006).

[*2]

BACKGROUND

The following facts, that are relevant to this appeal, are undisputed. By memorandum dated July 21, 2006, Timothy F. Hagan, Director, Office of Administration, informed the appellant that his access authorization (national security clearance) and Employment Clearance had been suspended "pending resolution of the substantial doubt that has been created concerning your eligibility for an NRC access authorization and employment clearance". Appeal File, Tab 9, Agency's Response, tab 4M. The July 21, 2006 memorandum also set forth at length, and in detail, the derogatory information that resulted in the appellant's access authorization suspension, which consisted of fifty-five separate alleged incidents. In addition, in that memorandum, the appellant was informed that he could obtain information concerning the derogatory information cited, that he could request a hearing, and that, in the alternative, he could submit a written answer within 20 days of his receipt. *Id.*

By memorandum also dated July 21, 2006, Mark Henry Salley, Team Leader, Fire Research Team, proposed to indefinitely suspend the appellant pending the final determination of his eligibility for access authorization [*3] and employment clearance. *Id.,* tab 4L. In the proposal notice, Mr. Salley cited all of the derogatory information that was cited in the July 21, 2006, notice of suspension of access authorization. *Id.* The appellant was also informed of the procedures under 10 C.F.R. part 10, that he could use to provide an answer to the derogatory information cited by the agency, and to request a hearing. *Id.*

On August 1, 2006, the appellant made an oral reply to the proposed indefinite suspension, and he also submitted numerous exhibits for the agency's consideration. *Id.,* Agency's Response, tabs 4C-4K.

Thereafter, by memorandum dated August 17, 2006, Patrick W. Baranowsky, Deputy Director, Division of Operating Experience and Risk Assessment, decided to indefinitely suspend the appellant effective August 22, 2006. *Id.,* tab 4B.

The appellant filed the instant appeal from the indefinite suspension. n2

n2 The appellant requested a hearing in this appeal, and one was scheduled. However, after a discussion with the parties during the prehearing telephone conference held on November 22, 2006, concerning the issues to be decided, I determined that there were no relevant and material facts in dispute in this appeal. Thus, the parties were allowed to give oral arguments on November 30, 2006. *See* AF, Tab 23, Agency's Summary of Prehearing Conference, and Tab 24, 2006, The Appellant's Exceptions to the Summary.

[*4]

ANALYSIS AND FINDINGS

Legal standard

In *Jones v. Department of the Navy,* 48 M.S.P.R. 680, *aff'd as modified on recons.,* 51 M.S.P.R. 607 (1991), *aff'd,* 978 F.2d 1223 (Fed. Cir. 1992), the Board held that an agency may indefinitely suspend an employee based on the suspension of his security access, or pending its investigation of his security clearance, where the agency believes that his retention in a duty status would be detrimental to government interests. The Board further found that it lacks the authority to review the merits of an agency's suspension of an employee's security access. *Id.* at 690, *citing, Department of the Navy v. Egan,* 484 U.S. 518, 527-32, 108 S.Ct. 818, 824-26, 98 L.Ed.2d 918 (1988).

In *Kriner v. Department of the Navy,* 61 M.S.P.R. 526 (1994), the Board reaffirmed that an agency may indefinitely suspend an employee based on its prior action with respect to his security access and that the Board may not inquire into the merits of the agency's [*5] reasons for the security access decision; the Board nonetheless held that it must assure that minimum due process requirements were accorded in the indefinite suspension action. Thus, where an indefinite suspension is based on the revocation of access to security areas or information, the agency must provide the appellant with a meaningful opportunity to respond to the reasons for the indefinite suspension by ensuring that either in the advance notice of that action, or in the earlier access determination, he has been notified of the cause that led to the access determination. Because an employee against whom an adverse action such as an indefinite suspension is taken is entitled to notice of the specific reasons for that action and to an opportunity to address those reasons in his response to the agency's proposal, only in this manner does the agency assure that the appellant is afforded meaningful due process with respect to his constitutionally protected property interest in his employment. *See, e.g., Holley v. Department of the Navy,* 62 M.S.P.R. 300, 303-04 (1994), *citing, Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985); [*6] *Stephen v. Department of the Air Force,* 47 M.S.P.R. 672, 681 (1991).

The appellant's position required a security clearance, his access authorization (national security clearance) had been suspended prior to his indefinite suspension, and he was informed of a condition subsequent when his suspension would end.

The parties stipulated that the appellant's Senior Reliability & Risk Engineer, GG-0840-15, position requires a security clearance, as do all positions at the agency. AF, Tab 23. The agency, therefore, has met its burden on this element. *See* 5 C.F.R. § 1201.63.

The record shows, and it is undisputed, that the appellant's access authorization (national security clearance) was suspended in a memorandum dated July 21, 2006. Agency's Response, tab 4M. In addition, the record shows, and it is undisputed that the appellant was informed in the August 17, 2006 decision to indefinitely suspend him of when the suspension would end, specifically, that it would "continue until such time as there is a final determination made on your eligibility for an access authorization (national security clearance) and employment clearance pursuant to the procedures [*7] set forth in 10 C.F.R. Part 10 ...". Agency's Response, tab 4B. Thus, the agency has met its burden on these elements.

The appellant was afforded minimum due process requirements in the indefinite suspension action.

As discussed above, the Board has held that it must assure that minimum due process requirements were accorded in the indefinite suspension action, and this requires that the agency provide the appellant with a meaningful opportunity to respond to the reasons for the indefinite suspension by ensuring that either in the advance notice of that action, or in the earlier access determination, he has been notified of the cause that led to the access determination. *See, e.g., Holley v. Department of the Navy,* 62 M.S.P.R. at 303-04; *Stephen,* 47 M.S.P.R. at 681.

The appellant argues that he was not provided minimum due process required by 5 U.S.C. § 7513, because he was not allowed a meaningful opportunity to reply to the reasons for the suspension of his access authorization prior to his indefinite suspension. *See* AF, Tabs 23 and 24, and Oral Argument, Tape A. I disagree. [*8]

As noted previously, the record shows that, in the July 21, 2006 notice of suspension of access authorization, as well as in the July 21, 2006 proposal to indefinitely suspend the appellant, he was specifically informed of the alleged derogatory information that resulted in the suspension of his access authorization. Agency's Response, tabs 4L and 4M. The appellant was also informed of the procedures under 10 C.F.R. Part 10, that he could use to provide an answer to the derogatory information cited by the agency and/or to request a hearing.

While the record shows that the agency "proposed" to indefinitely suspend the appellant prior to the conclusion of the time period that he was afforded to respond to the reasons for the suspension of his access authorization, the record shows, that he nonetheless was provided with an opportunity, and a process, to address the reasons for his access

authorization suspension, prior to when the decision was actually made to indefinitely suspend him. *See* Agency's Response, tabs 4L and 4M. Moreover, the agency argued, and it is undisputed, that the appellant did not avail himself of the opportunity that he was given to respond to the reasons for [*9] the suspension of his access authorization, even after he was indefinitely suspended. *See* AF 17, Agency's Prehearing Submissions, Exhibit 6. The record shows that the appellant was notified of the agency's decision to revoke his security clearance by letter dated October 25, 2006.

In addition, the record shows that the appellant received a written notice of proposal to indefinitely suspend him, an opportunity to reply to the proposed action orally and/or in writing, and a written decision to indefinitely suspend him. Agency's Response, tabs 4B; 4C-4K, and 4L. The record also shows that the appellant made an oral reply to the proposed indefinite suspension on August 1, 2006, and that he submitted numerous exhibits in his defense of the action. Agency's Response, tabs 4C-4K. While the record shows that the appellant was informed during his oral reply that the deciding official did not have the authority to hear or review the "suspension of [his] security clearance," the agency argues, and it appears from the transcripts of the oral reply, that he was not actually prevented from addressing the derogatory information that led to his security access suspension, in his defense of the [*10] proposed indefinite suspension. Agency's Response, tab 4C, Transcript of Oral reply, p. 5. If the appellant had made persuasive arguments and/or submitted convincing documentation concerning the derogatory information, it could have potentially effected the agency's decision to take the indefinite suspension, or at least delay it, even if the deciding official did not have the authority to make decisions concerning the appellant's security clearance.

Based on the above, I find that the appellant was afforded minimum due process in the indefinite suspension action, and that the agency has met its burden on this matter. n3

n3 I note that during the oral argument in this appeal that was held on November 30, 2006, the appellant stated that he is also arguing that the agency committed procedural error in the access authorization procedures, specifically, that it failed to follow the procedures of 10 C.F.R. Part 10, and also that it failed to follow the Atomic Energy Act (which he states required the agency to classify positions in terms of the degree of security clearance required for the position). However, I informed the appellant that the Board does not have jurisdiction over the propriety of the agency's access authorization procedures, beyond a determination as to whether, either in the advance notice of that action, or in the earlier access determination, the appellant was notified of the cause that led to the access determination, and whether he was provided with an opportunity to address those reasons.

[*11]
The agency was not required to attempt to reassign the appellant to a position that did not require a security clearance before indefinitely suspending him.

To be entitled to a reassignment under these circumstances, the appellant would be required to show that the agency had a policy, manifested by regulations, requiring such reassignment. *See Hesse v. Department of State,* 82 M.S.P.R. 489, 492 (1999), *aff'd,* 217 F.3d 1372 (Fed. Cir. July 6, 2000), *cert. denied,* 531 U.S. 1154 (Feb. 20, 2001); *Vanduzer v. Department of the Navy,* 41 M.S.P.R. 357, 361-62 (1989). The appellant in this case has not identified any regulation which required the agency to attempt to reassign him to a position which does not require access to classified information, before indefinitely suspending him. In any event, the parties have stipulated that all positions at the agency require a security clearance.

**DECISION**

The agency's action indefinitely suspending the appellant is AFFIRMED.

FOR THE BOARD:

Michelle M. Hudson

Administrative Judge

**NOTICE TO APPELLANT**

This initial [*12] decision will become final on **January 24, 2007,** unless a petition for review is filed by that date or the Board reopens the case on its own motion. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. You must establish the date on which you received it. The date on which the initial decision becomes final also controls when you can file a petition for review with the Court of Appeals for the Federal Circuit. The paragraphs that follow tell you how and when to file with the Board or the federal court. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

**BOARD REVIEW**

You may request Board review of this initial decision by filing a petition for review. Your petition, with supporting evidence and argument, must be filed with:

The Clerk of the Board

Merit Systems Protection Board

1615 M Street, NW.,

Washington, DC 20419

A [*13] petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition for review submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

If you file a petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. Your petition must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you more than 5 days after the date of issuance, 30 days after the date you actually receive the initial decision. If you claim that you received this decision more than 5 days after its issuance, you have the burden to prove to the Board the date of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by electronic filing is the date [*14] of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j).

**JUDICIAL REVIEW**

If you are dissatisfied with the Board's final decision, you may file a petition with:

The United States Court of Appeals for the Federal Circuit

717 Madison Place, NW.

Washington, DC 20439

You may not file your petition with the court before this decision becomes final. To be timely, your petition must be

received by the court no later than 60 calendar days after the date this initial decision becomes final.

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 ( 5 U.S.C. § 7703). You may read this law, as well as review the Board's regulations and other related material, at our [*15]  website, http://www.mspb.gov. Additional information is available at the court's website, http://fedcir.gov/contents.html. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11.

### NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Administrative LawAgency AdjudicationDecisionsGeneral OverviewGovernmentsFederal GovernmentDomestic SecurityGovernmentsFederal GovernmentEmployees & Officials